**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SA'ID NASIR<br>56 Crosskeys Lane, Apt. 109<br>Ewing, NJ 08628 | CIVIL ACTION |
| Plaintiff,<br>v. | CASE NO.: |
| GDI SERVICES INC. d/b/a<br>GDI INTEGRATED FACILITY<br>SERVICES INC.<br>780 5th Avenue, Suite 115<br>King of Prussia, PA 19406 | **JURY TRIAL DEMANDED** |
| and | |
| BRANDYWINE REALTY TRUST<br>2929 Arch Street, Suite 1800<br>Philadelphia, PA 19104 | |
| Defendants. | |

**CIVIL ACTION COMPLAINT**

Sa'id Nasir (hereinafter referred to as "Plaintiff"), by and through his undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1. This action has been initiated by Plaintiff against GDI Services Inc. d/b/a GDI Integrated Facility Services Inc. ("Defendant GDI") and Brandywine Realty Trust ("Defendant BRT") (hereinafter collectively referred to as "Defendants") for violations of the Family and Medical Leave Act ("FMLA" – 28 U.S.C. § 2601 *et seq.*), the Americans with Disabilities Act, as amended ("ADA" - 42 USC § 12101 *et. seq*.), the Age Discrimination in Employment Act ("ADEA" – 29 U.S.C. § 621 *et seq.*), the Pennsylvania Human Relations Act ("PHRA" – 43 P.S. § 951 *et seq.*), the Philadelphia Fair Practices Ordinance ("PFPO" – Phila. Code § 9-1100 *et*

*seq.*), and Pennsylvania common law.[1] Plaintiff asserts, *inter alia*, that he experienced unlawful workplace discrimination and retaliation, culminating in his termination from Defendants on or about March 27, 2026. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§1331 and 1343(a)(4) because it arises under laws of the United States and seeks redress for civil rights violations under the ADA, Section 1981, and Title VII. There lies supplemental and/or ancillary jurisdiction over Plaintiff's state and local law claims, as they arise out of the same common nucleus of operative fact(s) as Plaintiff's federal claims asserted herein.

3. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

5. On or about May 13, 2026, Plaintiff dual-filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted his

[1] Plaintiff intends to amend his instant Complaint to include claims arising under the PHRA/PFPO on or about May 13, 2027, once his administrative remedies as to those claims are fully exhausted with the PHRC. Plaintiff's claims arising under the PHRA/PFPO will mirror the instant ADA/ADEA claims.

administrative proceedings before initiating this action by timely filing his Charge with the EEOC, and by filing the instant lawsuit under the ADA and ADEA within 90 days of receiving a right-to-sue letter from the EEOC.

**PARTIES**

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual, with an address as set forth in the caption.

8. Defendant GDI is incorporated under the laws of the state of Delaware with a principal place of business in Pennsylvania located at the address in the caption above.

9. Defendant GDI operates as an enterprise providing commercial cleaning and facility maintenance to third-party locations, employing more than 20,000 employees.

10. Defendant BRT is incorporated under the laws of the state of Maryland with a principal place of business in Pennsylvania located at the address in the caption above.

11. Defendant BRT owns, rents, and operates real estate in the greater Philadelphia market through 200-400 employees.

12. One of the buildings owned and operated by Defendant BRT is the Internal Revenue Service ("IRS") building located at 2970 Market Street, Philadelphia, PA 19104 (hereafter, the “IRS Building”).

13. Typically, there was management of Defendant BRT on the premises of the IRS Building. While Plaintiff was working at the IRS Building, as discussed *infra*, Plaintiff had to: (a) follow Defendant BRT’s directions; (b) abide by Defendant BRT’s policies and procedures; (c) seek permission from Defendant BRT for various matters; and, (d) overall heed management of Defendant BRT.

14. Based on the foregoing, Defendants GDI and BRT are sufficiently interrelated and integrated in their management of Defendants' employees (including Plaintiff during his relevant period of employment), such that they may be treated as a joint employer for purposes of the instant action.

15. At all times relevant herein, Defendants acted by and through their agents, servants and/or employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

**FACTUAL BACKGROUND**

16. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

17. Plaintiff was hired by Defendant GDI in or about July 2023; and in total, Plaintiff was employed by Defendant GDI for almost three (3) years.

18. Plaintiff was initially hired as an Account Manager with Defendant GDI to manage their account with One Liberty Place ("OLP") in Philadelphia, PA.

19. As an Account Manager at OLP, Plaintiff typically worked 50-60 hours per week ensuring client needs were met and employees performed well. Plaintiff also handled planning and payroll matters.

20. Some of Plaintiff's relevant management at Defendant GDI included: (1) District Manager Carla Harris ("Harris"); (2) Director of Operations Felipe Rodriguez ("Rodriguez"); and, (3) Vice President Brad Reep ("Reep"). Harris, Rodriguez, and Reep were direct employees (and higher-level management) of Defendant GDI.

21. While working at OLP, Plaintiff was also supervised by Cory Gunselman ("Gunselman"), the Assistant Director of Cushman & Wakefield ("CW"), who served as the property manager at OLP.

22. Plaintiff is a 70-year-old man.

23. Plaintiff suffer from numerous health problems, including but not limited to arthritis, glaucoma, knee problems, prostate concerns, high blood pressure, and other complications (as this is not intended to provide an exhaustive list, but rather, a short summary). Plaintiff's medical conditions substantially limited his ability to engage in certain major life activities, such as walking and running. But, Plaintiff very much enjoyed working and despite periodic health flareups, Plaintiff worked in is role very well.

24. As discussed *infra*, Plaintiff also had a workers' compensation case from a slip-and-fall at work in or around September 2025 (causing him some physical exacerbation of ongoing health concerns, and in particular, to his right knee).

25. In or around November 2024, Reep and Harris came to visit Plaintiff at his office at OLP. Reep asked him how things were going at OLP and he responded that things were going well.

26. Reep then said to Plaintiff "word on the street is that you're retiring." This was very surprising to Plaintiff as he had no plans to retire at that time.

27. Plaintiff responded to Reep that he was not retiring. Plaintiff said that he would give Defendant GDI advanced notice of his retirement so they could bring in his replacement. Plaintiff said he would then stay on as long as Defendant GDI wanted him to stay to get his replacement up to speed.

28. On or about November 21, 2024, Gunselman approached Plaintiff and said "congratulations on your retirement." Plaintiff was again surprised that Defendant GDI thought he was going to retire.

29. Plaintiff responded to Gunselman that he was not retiring and that it was Reep who was going around saying that he was retiring, even though that was not true.

30. Gunselman told Plaintiff to tell Reep that he was not retiring. Plaintiff assured Gunselman that he had already been telling Reep that he was not retiring. Plaintiff did not understand why Reep was going around and telling other people that he was retiring, even though Plaintiff had previously told Reep that he was not retiring.

31. In or around December 2024, Harris came to OLP and asked Plaintiff to take a tour of the building. Plaintiff believed that Defendant GDI had already hired his replacement so he asked Harris if she had met them. Harris told Plaintiff that she had not met Plaintiff's replacement.

32. The next day, during a meeting in the property management office at OLP, CW's Operations Manager Alan Moretti ("Moretti") mentioned that Harris, Reep, and "the new girl" had been at OLP three (3) weeks ago. Plaintiff was blown away that Harris had already met his replacement and lied to him and told him that she had not met this new replacement.

33. On or about January 9, 2025, Rodriguez came to meet with Plaintiff at OLP. Rodriguez told Plaintiff that he was coming to discuss Plaintiff's retirement exit and training of his replacement.

34. Plaintiff told Rodriguez that he was not retiring and that he did not know why Reep kept saying that he was retiring.

35. Rodriguez then told Plaintiff that he wanted to talk to Plaintiff about his retirement exit plan. Plaintiff repeated that he was not retiring. Rodriguez then said that he would have to talk to Reep about the situation.

36. On Plaintiff's way home, Rodriguez called him with Reep on the line as well. Reep said to Plaintiff "I thought I made myself clear about that One Liberty situation." Plaintiff responded "I never told you that I was retiring. That's something that you initiated." Reep continued to argue with Plaintiff and told him "that person that I hired is going to OLP." Plaintiff then got quiet until the call ended. Plaintiff believed that Defendant GDI was trying to force him out because he was too old and had disabilities.

37. On or about January 15, 2025, Reep, Harris, and Rodriguez came to Plaintiff's OLP office. Reep apologized to Plaintiff and said that he had made a mistake. Despite his apparent apology, Reep then said "the ball is rolling and it can't be stopped" (referring to Plaintiff being forced out of OLP by his replacement that Defendant GDI had already hired).

38. Reep told Plaintiff that he had "a few ideas" and that one of them was to put Plaintiff in a building that was not far down the road (referring to the IRS Building). Reep said that the IRS Building was "not a bad building, but it needs some love," "somebody like you in this building would do fantastic," and "plus you would be doing me a favor." Reep also said that "the crew is not that bad of a crew, but they need some good leadership, you can provide that." Reep told Plaintiff that "the management company is not as bad as Cushman & Wakefield."

39. Reep told Plaintiff that "if it wasn't for you, then GDI would not have renewed the OLP contract with Cushman & Wakefield." Plaintiff took this to mean that CW renewed their contract with Defendant GDI because they liked working with him.

40. Reep said that if Plaintiff did not want to go to the IRS Building and retire instead, then Reep could get him a severance package. Plaintiff told Reep that he would have to discuss what he wanted to do with his family.

41. Plaintiff decided to stay at Defendant GDI and get transferred to the IRS building, even though it was a less desirable assignment than OLP. It was much easier for Plaintiff to work at OLP than at the IRS Building because of how the buildings were structured. OLP is primarily vertical, whereas the IRS Building is primarily horizontal. This meant that Plaintiff would have to walk substantially further distances while working at the IRS Building than when he worked at OLP.

42. On or about January 21, 2025, Plaintiff's replacement Belinda Killings ("Killings"), who was in her early/mid 50s, started at OLP as an Account Manager.

43. Plaintiff trained Killings until on or about March 1, 2025.

44. On or about March 1, 2025, Plaintiff was transferred to the IRS Building as their Account Manager working for both Defendants GDI and BRT.

45. While working at the IRS Building, Plaintiff was primarily managed from Defendant BRT by Anita Nesfeder ("Anita"). (Plaintiff is assuming her last name based upon online research). Anita supervised Plaintiff at the IRS Building for most of his tenure there.

46. During the second half of 2025, Anita took a leave of absence. Jackie Blowes ("Jackie") served as Anita's replacement from Defendant BRT at the IRS Building during Anita's lengthy absence. (As with Anita, Plaintiff is assuming Jackie's last name based upon online research). Thus, leading up to Plaintiff's FMLA leave, discussed *infra*, Jackie was the primary overseer of the IRS Building on behalf of Defendant BRT.

47. Defendant BRT was much more difficult to work for than CW. Every week, Plaintiff had to inspect approximately 800,000 square feet of the IRS Building. Walking for extensive distances at the IRS Building exacerbated Plaintiff's disabilities. On top of that, Defendant BRT was much more demanding on Plaintiff than was CW while he was working at OLP.

48. In or around April 2025, the OLP building contract went up for bid.

49. In or around June 2025, Defendant GDI lost the contract for OLP effective on or about July 1, 2025. Around this time, Reep left Defendant GDI. Harris told Plaintiff that Defendant GDI had lost the OLP contract because they moved him away from OLP. Harris's comment to Plaintiff cemented his belief that he was pushed out of working at OLP because of his age and disabilities, since he was such a good worker and it made no sense for him to be removed from working at OLP.

50. In or around September 2025, Plaintiff was performing an inspection of the IRS Building with Defendant GDI's Inspector Tyrique Gamble ("Gamble"). While Plaintiff was walking between floors, he slipped down the stairs. Plaintiff did not think much of it and continued to walk. As he was walking, Plaintiff's right knee was swelling up and getting bigger.

51. Plaintiff went to see his doctor, who told him that he had sprained his right knee. Plaintiff's doctor also drained fluid from his right knee.

52. In or around October 2025, Plaintiff got an MRI on his right knee, which showed that he had a torn meniscus. Plaintiff's doctor put him out of work for thirty (30) days.

53. In or around November 2025, Plaintiff commenced a medical leave of absence. Plaintiff sought and was approved for such leave under FMLA. Plaintiff's doctor extended his initial thirty (30) day leave two (2) times, each time by thirty (30) additional days.

54. Prior to Plaintiff's medical leave commencing in or around November 2025, there was a clear perception by Defendants' management that Plaintiff should not work solely because of his health and/or age.

55. Jackie was extremely discriminatory in perceptions about and towards Plaintiff, and she was quite vocal about it as well.

56. Plaintiff limped at times due to pain in his knees because of his arthritis, but that did not prevent him from performing is role or essential duties.

57. On numerous occasions, Jackie would come up to Plaintiff and say things like: (a) "think about what you should really be doing at your age;" (b) "you shouldn't be working at your age;" (c) "you are too old for this;" (d) "look, it's too hard for you to even walk," (e) "can you do what you need to here" (in reference to Plaintiff's health); (f) "you really need to consider retiring;" and (g) other iterations of these types of discriminatory perceptions and comments. She made her views very clear to Plaintiff that he should not be working because of his age or the state of his health (which were very discriminatory perceptions on her part).

58. On or about October 2025, Plaintiff submitted a workers' compensation claim for his right knee injury.

59. On or about December 2025, Plaintiff's workers' compensation claim was denied.

60. On or about February 14, 2026, Plaintiff called Harris and told her that he was going to his doctor on February 16, 2026 to be cleared to return to work on February 17, 2026. Harris told Plaintiff that this was fine.

61. On or about February 16, 2026, Plaintiff emailed Defendant GDI his doctor's note clearing him to return to work on February 17, 2026.

62. Plaintiff was supposed to return from FMLA leave on or about February 17, 2026. Plaintiff had provided medical clearance to return to work from FMLA leave in advance of February 17, 2026.

63. When Plaintiff tried to return to work from his FMLA leave on or about February 17, 2026, Plaintiff was not allowed to do so by Defendants.

64. Plaintiff could not get a clear answer on why he was not allowed to return from FMLA leave.

65. Plaintiff had not been warned or disciplined for any reason leading up to his FMLA leave.

66. On or about February 26, 2026, Plaintiff was trying to follow up yet again via email to Harris and Defendant GDI's Human Resources Manager Kaleigh Fulmer ("Fulmer").

67. In this email to Fulmer, Plaintiff stated: "It has been 2 weeks since I have sent my clearance from my doctor that I can return to work. My workman's comp was turned down. You said that you are getting more information, maybe I can help. Could you please let me know what is happening. Thank you."

68. Defendant GDI was stonewalling Plaintiff and totally non-responsive to him about his return from FMLA leave.

69. On or about March 3, 2026, Plaintiff emailed Fulmer and Harris again stating:

> I have tried reaching out to Karla on March 28th and February 3rd to try and get answers to what is going on job wise. I just recently sent you an email on February 26th asking for clarity as well as called and left you a message on March 3rd at 2:58PM trying to get more information on my employment status. In a email on February 17th you said that you will get back to me with more information, this was after I sent you my clearance from the Rothman that I could return to work with no restrictions this was about 3 weeks ago. I have yet to hear anything from you. The only thing that has happened is that I have been kept in limbo with no answers. My workman comp has been denied, from an injury sustained at work, bills have not been paid, I have not been paid. Should I take

> your silence to mean that I should seek legal counsel and open a claim. I look forward to speaking with you.

70. After not giving Plaintiff any meaningful information for nearly three (3) weeks and Plaintiff continuing to ask how he could be reinstated from his FMLA leave, Fulmer finally got around to emailing him the following in the evening of on or about March 3, 2026 (presumably after Plaintiff mentioned seeking legal counsel): "Sa'id unfortunately, there have been some concerns that have come up and the customer at your previous location does not wish for you to return to their building. We are working diligently to find you a position with the same job title and salary. We should have more information for you by tomorrow." Fulmer was referring to Defendant BRT when she said "the customer at your previous location," thus confirming that Defendant BRT participated in the decision to terminate Plaintiff from working at the IRS Building.

71. Fulmer was generally non-informational, non-responsive, and disorganized.

72. On or about March 26, 2026, after providing no updates, Fulmer texted Plaintiff's wife's phone incorrectly asking to schedule a call with him.

73. Plaintiff had to reach out to Fulmer on or about March 27, 2026 directly to provide her with his telephone number despite her ability to review his personnel file or his prior calls to her where Plaintiff had asked for updates (and his telephone number was readily discernible).

74. The handling of Plaintiff's attempt to return from FMLA leave (which is also a medical accommodation under anti-discrimination laws) was atrocious.

75. On or about March 27, 2026, Fulmer offered Plaintiff a role as an Account Manager working for SEPTA.

76. But in Plaintiff's opinion, Fulmer knew there was no way Plaintiff could accept such a role. Plaintiff worked an 8 AM – 4 PM shift previously for Defendants, as he needed that general timeframe for his health, medication regimen, and sleep regimen. The role offered with SEPTA was only Monday to Friday working 3 PM – 11:30 PM or overnight (a/k/a graveyard shifts). Plaintiff could not medically do that, and he told Fulmer that he could not work such shifts as an Account Manager.

77. On or about March 27, 2026, Plaintiff emailed Fulmer and stated:

> I can't sacrifice my health or risk injuring myself with your job offer. I want to work, but I would need something equivalent to what I had before. I am 70 yrs old, and I take different meds. I used to work 8 AM – 4 PM. Because of my health problems, I get very fatigued, need to keep my medical regimen, and have to be on a sleep cycle. I don't even stay up as late as my shift would end at the job you mention. I also live an hour away from the work sites. I can't get home at midnight or later, or I'll have major health complications. I also don't feel safe driving that late on meds and because of my fatigue. I would have tried to look past the totally different job position, but in thinking through this, the late nights can't happen. Also, not sure what you meant I used to work nights. I never worked nights. I did sometimes check on things when needed after hours or stay a little later than my prior shifts, but I didn't work night shifts while with GDI. Can I be reconsidered for my prior assignment? Who are you saying complained about me because I have never heard any details, by who or what type of complaints? Makes no sense. Thanks.

78. Fulmer did not offer Plaintiff any other jobs with Defendant GDI and Defendants refused to reinstate Plaintiff to work at the IRS Building.

79. Plaintiff was then effectively fully terminated with all accesses canceled and no further communication after Defendant GDI feigned a new job offer due to his perpetual follow-up efforts. Plaintiff was offered nothing comparable or a role he could actually (medically or otherwise) perform.

80. To Plaintiff's knowledge, he was replaced during his FMLA leave by Shantel Ayres ("Ayres"), who is in her mid-40s and substantially younger than him, and who was far less

qualified as she was previously an hourly (and non-salaried) employee whom Plaintiff had supervised. Ayres was retained in lieu of reinstating Plaintiff from FMLA leave.

81. Plaintiff was not accommodated or reinstated from his accommodation / FMLA leave. Instead, Plaintiff was terminated and he was not given a comparable role at any business as an account manager *on a shift Plaintiff actually could have worked*, as Defendant GDI could have easily transferred or adjusted anyone else or given him an open opportunity (as such transfers occurred all the time internally as to adjustments to scheduling). Thus, Defendants pursued all such discriminatory and retaliatory actions against Plaintiff.

82. Moreover, Defendant GDI confirmed verbally and in writing that Defendant BRT (a legal joint employer with Defendant GDI) participated in the decision to remove or terminate Plaintiff post-FMLA leave. Defendant BRT is therefore also liable for discrimination and retaliation asserted herein.

83. In the event that Defendant BRT does not qualify as Plaintiff's employer, it is established that **<u>an at-will employee</u>** can pursue the tort of intentional interference with contractual relations against a third-party (such as Defendant BRT) as well. *See Salsberg v. Mann*, 310 A.3d 104, 119-26 (Pa. 2024) (holding that a claim for tortious interference with contractual relations arises when a third-party intentionally and improperly interferes with an employee's at-will employment with her employer).

84. Based on the foregoing, Plaintiff believes and avers that Defendants terminated him: (1) because of his age; (2) because of his actual/perceived/record of disabilities; (3) in retaliation for requesting reasonable accommodations and/or FMLA leave; and/or, (4) because of their failure to engage in the interactive process with Plaintiff and/or accommodate his disability.

85. Based on the foregoing, Plaintiff believes and avers that Defendants wrongfully terminated his employment in violation of the FMLA, ADA, and ADEA.

**COUNT I**
**Violations of Family and Medical Leave Act ("FMLA")**
**(Retaliation)**
**[Against Both Defendants]**

86. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

87. Plaintiff was a full-time employee who worked for Defendants for more than one (1) year within a location that employed at least 50 employees within 75 miles.

88. Defendants refused to reinstate Plaintiff to his position as Account Manager working at the IRS Building immediately following the expiration of his FMLA leave.

89. Defendants' termination of Plaintiff is extremely suggestive and was done in close proximity to his usage of FMLA-qualifying leave.

90. The motivating and/or determinative factor in Defendants' decision to terminate Plaintiff's employment was his request and/or use of FMLA leave.

91. Defendant retaliated against Plaintiff in violation of the FMLA by: (1) terminating Plaintiff because he requested FMLA leave and/or exercised his FMLA rights; (2) considering Plaintiff's FMLA leave needs in making the decision to terminate him; (3) terminating Plaintiff to prevent him from taking FMLA-qualifying leave in the future; and/or, (4) taking actions towards him that would dissuade a reasonable person from exercising his rights under the FMLA.

**Count II**
**Violations of the Americans with Disabilities Act, as Amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Failure to Accommodate)**
**[Against Both Defendants]**

92. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

93. Plaintiff believes and avers that his actual, perceived, and/or record of disabilities was a motivating and/or determinative factor in Defendants' decision to terminate his employment.

94. Plaintiff also believes and avers that he was terminated from his employment with Defendants because he engaged in protected activity under the ADA, including but not limited to requesting reasonable medical accommodations in the form of FMLA leave.

95. Plaintiff also believes that Defendants failed to accommodate his disability by terminating his employment to avoid having to do so.

96. Plaintiff asserts that Defendants' decisions (discussed *supra*) were made in violation of the ADA for discriminatory/and or retaliatory reasons.

**COUNT III**
**<u>Violations of the Age Discrimination in Employment Act ("ADEA")</u>**
**(Age Discrimination)**
**[Against Both Defendants]**

97. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

98. Defendants terminated Plaintiff because of his age, and upon information and belief replaced him with an objectively unqualified and substantially younger employee.

99. Plaintiff believes and avers herein that his age was a determinative factor in Defendants' decision to terminate him.

100. These actions as aforesaid constitute unlawful discrimination under the ADEA.

**Count IV**
**<u>Tortious Interference with Contractual Relations</u>**
**(in the alternative)**
**[Against Defendant BRT]**

101. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

102. During Plaintiff's employment with Defendant GDI, he was subjected to and observed disparate and discriminatory treatment based on age, disabilities, and his usage of FMLA leave.

103. Plaintiff believes and avers that he was terminated because of his age, disabilities, and/or usage of FMLA leave.

104. Plaintiff also avers that Defendant BRT intentionally and improperly caused Defendant GDI to terminate Plaintiff's employment by convincing Defendant GDI to terminate Plaintiff because of his age, disabilities, and/or usage of FMLA leave.

105. These actions constitute tortious interference with contractual relations under Pennsylvania common law. *See Salsberg v. Mann*, 310 A.3d 104, 119-26 (Pa. 2024) (holding that a claim for tortious interference with contractual relations arises when a third-party intentionally and improperly interferes with an employee's at-will employment with his employer).

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to be prohibited from continuing to maintain their illegal policy, practice or custom of discriminating/retaliating against employees and are to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B. Defendants are to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date he first suffered retaliation/discrimination at the hands of Defendants until the date of verdict;

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law(s);

D. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

G. Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: ______________________

Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
akarpf@karpf-law.com
(215) 639-0801

Dated: August 31, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

# CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Sa'id Nasir | : | CIVIL ACTION |
| v. | : | |
| GDI Services Inc. d/b/a GDI Integrated Facility Services Inc., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (x )

| 8/31/2026 | [signature] | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DESIGNATION FORM

Place of Accident, Incident, or Transaction: Defendants place of business

***RELATED CASE IF ANY:*** Case Number:______________ Judge:______________

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

***A. Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☒ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief ***see certification below***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:______________

**B. *Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury (*Please specify*):______________
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*______________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

[ X ] Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

[ ] None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

NASIR, SA'ID

**(b)** County of Residence of First Listed Plaintiff: Mercer

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

**DEFENDANTS**

GDI SERVICES INC. D/B/A GDI INTEGRATED FACILITY SERVICES INC., ET AL.

County of Residence of First Listed Defendant: Montgomery

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [X] 445 Amer. w/Disabilities - mployment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
ADA (42USC12101); FMLA (28USC2601); ADEA (29USC621)

Brief description of cause:
Violations of the ADA, FMLA, ADEA, PHRA, PFPO and PA Common Law.

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*:

JUDGE ____________ DOCKET NUMBER ____________

DATE 8/31/2026 SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______